Patrick Mause, Bar No. 24269
LAW OFFICE OF PATRICK MAUSE, PLLC
290 North Meyer
Tucson, Arizona 85701
Telephone: (520) 342-0000
Facsimile: (520) 342-0001
Patrick@PMauseLaw.com

*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Melanie Flitcraft,<br><br>  Plaintiff,<br><br>  v.<br><br>Metropolitan Life Insurance Company, a foreign corporation; American Express Life Insurance Plan, an ERISA-governed benefit plan; American Express Company Employee Benefits Administration Committee, an ERISA plan administrator,<br><br>  Defendants. | **COMPLAINT<br>AND JURY DEMAND** |

  For her Complaint, Melanie Flitcraft ("Plaintiff") alleges as follows:

**Parties, Venue, and Jurisdiction:**

  1. Ms. Flitcraft is a resident of Maricopa County, Arizona.

  2. Ms. Flitcraft's claims include: breach of contract (Count One) and breach of the implied duty of good faith and fair dealing (Count Two). Because one or more of the defendants has asserted that Ms. Flitcraft's claims may be subject to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq*. ("ERISA"), Ms. Flitcraft pleads in the alternative claims for benefits due to her under ERISA (Count Three), equitable relief under ERISA (Count Four), waiver under ERISA (Count Five), and statutory penalties due to

1

defendants' failure to timely provide information relevant to Ms. Flitcraft's claim under ERISA (Count Six).

3. Defendant Metropolitan Life Insurance Company ("MetLife") is a foreign corporation authorized to do business and doing business in Arizona.

4. Defendant American Express Life Insurance Plan is an ERISA-governed benefit plan.

5. Defendant American Express Company Employee Benefits Administration Committee is an ERISA plan administrator.

6. As an insurer engaged in the business of insurance, licensed to do business within Arizona, MetLife, its officers, directors, employees, and agents are charged with knowledge of the laws of Arizona such as those laws pertaining to the business of insurance including statutory, regulatory and common law obligations.

7. There is complete diversity between the parties and the amount in controversy exceeds $75,000.00. This court has diversity of citizenship subject matter jurisdiction over the parties pursuant to 28 U.S.C. § 1332(a)(1).

8. To the extent ERISA may apply to this action, the Court has jurisdiction under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391.

9. Venue is proper in this District.

**Background:**

10. This case involves Plaintiff Melanie Flitcraft's claim for life insurance benefits under a disability policy issued to her husband, Stephen "Brian" Flitcraft.

11. Mr. Flitcraft began working for American Express in 1996.

12. In 2012, Mr. Flitcraft was covered under the American Express Life Insurance Plan (the "Plan").

13. In 2012, American Express reorganized Mr. Flitcraft's division and laid him off. Upon information and belief, this is a frequent practice of American Express and one which often results in the employee being rehired shortly thereafter.

14. As part of his severance package, American Express continued Mr. Flitcraft's life insurance coverage under the Plan.

15. When his severance expired in October 2012, Mr. Flitcraft converted his coverage to an individual policy (the "Converted Coverage") in the amount of $242,000, as allowed under the Plan.

16. After converting his coverage to an individual policy, Mr. Flitcraft paid premiums on the Converted Coverage directly to MetLife through an automatic bank account withdrawal.

17. Mr. Flitcraft designated his wife, Ms. Flitcraft, as the primary 100% beneficiary under the Converted Coverage.

18. A few months after his severance ended, and consistent with American Express' past practices, American Express rehired Mr. Flitcraft. Upon his rehiring, American Express informed Mr. Flitcraft that he was, as he always had been, eligible to enroll in its life insurance Plan.

19. To inform Mr. Flitcraft about the Plan benefits, options, requirements, and limitations, American Express provided Mr. Flitcraft with the Plan's Summary Plan Description ("SPD"). A true and correct copy of the SPD American Express provided to Mr. Flitcraft is attached hereto as Exhibit 1.

20. The SPD states: "This document, along with the insurance contracts through which benefits are provided, is also the written instrument for the Plan for purposes of section 402(a)(1) of the Employee Retirement Income Security Act of 1974.":

> This document is the Summary Plan Description for the American Express Life Insurance Plan. This document, along with the insurance contracts through which benefits are provided, is also the written instrument for the Plan for purposes of section 402(a)(1) of the Employee Retirement Income Security Act of 1974.

*See* SPD, Ex. 1, at 3.

21. Under ERISA: "Every employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1).

22. Because the SPD states that it is "the written instrument for the Plan," the SPD is the operative plan document and therefore governs Mr. Flitcraft's rights and obligations under the Plan.

23. The SPD explained to Mr. Flitcraft that American Express provided him with "basic life insurance of one times your annual salary at no cost." *See* SPD, Ex. 1 at 3. The SPD then explained that he could elect optional life coverage of up to "9 times employee's annual salary." *See* SPD at 9.

24. To assist employees in determining how much optional coverage to elect, the SPD provided several considerations:

> **Things to Consider When Electing Life Insurance Coverage**
> When you're trying to decide the amount of life insurance to elect, think about your current financial status, responsibilities and future goals, and consider the following questions:
> - Do you have debts (such as college loans or credit card balances) that would need to be paid if you died?
> - Do you share responsibility for your personal debt with anyone else, such as your spouse/ domestic partner or your parents?
> - Do you have any dependents who rely on you for financial support and would need support if you died?
> - Do you plan to help your children pay for their education?
> - Do you have a mortgage to pay?
> - Do you have any additional savings or benefits from other insurance plans that would help support your dependents?

*See* SPD, Ex. 1 at 10.

25. Because Mr. Flitcraft had a family, including a wife and two children who relied on him for financial support, because he intended to pay for their children's education, and because he had a mortgage on the family home, among other things, Mr. Flitcraft elected optional coverage in the amount of four times his annual salary; bringing his total coverage under the Plan to five times salary: one times salary automatic coverage plus four times salary optional coverage. Mr. Flitcraft's Plan coverage therefore totaled $529,000.

26. Thus, Mr. Flitcraft's total life insurance coverage through MetLife was $771,000: $242,000 under the Converted Policy, and $529,000 under the Plan coverage.

27. The SPD also informed Mr. Flitcraft about enrollment and eligibility policies and limitations. Regarding enrollment, for example, the SPD informed him that he was

4

"automatically covered for Basic Life Insurance Coverage" and could "elect to participate in Optional Life Insurance":

> **Enrollment**
>
> If you are classified by the Company as a regular full-time or part-time employee, you're automatically covered for Basic Life Insurance Coverage under the Life Insurance Plan.
>
> Once you're eligible, you can elect to participate in Optional Life Insurance and AD&D Insurance.

*See* SPD, Ex. 1 at 5.

28. The SPD further explained the limitations on coverage if an employee ceased working for American Express and was rehired. Specifically, the SPD informed Mr. Flitcraft that if he stopped working for American Express but was rehired "during a subsequent calendar year," he would be "allowed to elect benefits based on your eligibility in the new year":

> **If You Are Rehired**
>
> If your employment ends but you are rehired later that same calendar year, your Life Insurance Plan elections in effect on your termination date will be reinstated. If your employment ends and you return to work during a subsequent calendar year, you'll be allowed to elect benefits based on your eligibility in the new year.
>
> If your employment ends and you return to work within 12 months as a part-time employee, you'll be given credit for time worked toward becoming eligible for benefits (e.g., if you worked three months, you'd only need to work three more months to be eligible for benefits).

*See* SPD, Ex. 1 at 8.

29. Because Mr. Flitcraft had been laid off and his severance and coverage ended in 2012, and because he returned to work in 2013 — a different calendar year — he would be "allowed to elect benefits based on your eligibility in the new year" under the SPD's clear terms. *Id*.

30. Finally, the SPD explained that as long as Mr. Flitcraft enrolled within 60 days of being hired, his coverage "starts on the day you begin regular full-time employment with the Company":

> **When Coverage Begins**
>
> If you're a regular full-time employee and enroll within 60 days following your hire date, your coverage starts on the day you begin regular full-time employment with the Company, if you are actively at work on that day. If you are absent for any reason, coverage will begin on the day you start active full-time employment with the Company.
>
> If you're a regular part-time employee and enroll within 60 days following completion of six months of service, your coverage begins on the date the six-month waiting period is completed. If you're a part-time employee and change your status to full-time before you
>
> 6                                                                                    January 1, 2013

> complete six months of service, you have 60 days from your qualified status change date to enroll for Life Insurance benefits.
>
> Coverage will not begin until you have provided a copy of Form I-9 (authorization to be employed in the United States). Once you provide the properly completed Form I-9, coverage will begin as of the date you are eligible for benefits.
>
> Following your initial eligibility for benefits, coverage begins as described below:
>
> - **Coverage elected during annual enrollment**—January 1, or upon approval of proof of good health for the Life Insurance Plan by the insurance carrier, whichever is later.
> - **Coverage elected as a result of a qualified status change**—date of qualified status change, or the day following approval of proof of good health for the Life Insurance Plan by the insurance carrier, whichever is later.
>
> Contributions will be deducted from your pay to cover any retroactive period of coverage based on the effective date of coverage.

*See* SPD, Ex. 1 at 6-7.

31. Mr. Flitcraft completed all the requirements to enroll for coverage in the amount of five times his salary at the time of his hiring, January 2013.

32. Mr. Flitcraft designated his wife, Melanie Flitcraft, as the primary 100% beneficiary under the Plan.

33. Following his 2013 enrollment, American Express began deducting premiums for his Plan coverage from his paychecks. This is consistent with American Express' previous practice of deducting insurance premiums from his paychecks.

34. Upon information and belief, American Express forwarded Mr. Flitcraft's premiums to MetLife and informed MetLife that Mr. Flitcraft was enrolled under the insurance policy issued to the Plan.

35. At the same time, Mr. Flitcraft continued to pay the premiums for his Converted Coverage to MetLife through an automatic bank account deduction.

36.     As of January 2013, when Mr. Flitcraft enrolled in life insurance coverage under the Plan, MetLife was on notice that Mr. Flitcraft was insured under both the Converted Coverage and the Plan because it was receiving and accepting his premiums on both policies.

37.     As of January 2013, American Express knew that Mr. Flitcraft could have been covered under the Converted Coverage and the Plan because it knew Mr. Flitcraft could have elected Converted Coverage, and it knew that he enrolled for five times salary coverage under the Plan.  Upon information and belief, when Mr. Flitcraft was laid off, American Express provided him with the conversion information and forms and was aware that he had elected the Converted Coverage.

38.     The American Express Employee Benefits Administration Committee ("Benefits Committee") and MetLife are ERISA fiduciaries under the Plan.  *See* SPD, Ex. 1 at 22.

39.     Under ERISA, defendants MetLife, the Benefits Committee, and the Plan must discharge their obligations solely in Mr. Flitcraft's interests.  *See* 29 U.S.C. § 1104; *see also* SPD, Ex. 1 at 31.

40.     On October 11, 2014, one week before his and Ms. Flitcraft's 17th wedding anniversary and nearly two years after being rehired and beginning to pay premiums on the Plan coverage — Mr. Flitcraft passed away suddenly and unexpectedly due to sepsis secondary to bronchopneumonia.

41.     A few weeks later, in November 2014, Ms. Flitcraft contacted MetLife to perfect her claims for benefits under Mr. Flitcraft's Converted Coverage in the amount of $242,000 and under the Plan coverage in the amount of $529,000.

42.     When Ms. Flitcraft contacted MetLife, MetLife confirmed that Mr. Flitcraft was covered under both policies.  MetLife further informed Ms. Flitcraft that even though Mr. Flitcraft had two policies, she could submit one claim form for both claims.  At no point during that discussion did MetLife indicate that there was any alleged conflict in Mr. Flitcraft's being covered under both policies.

43.     After receiving Ms. Flitcraft's claim, MetLife began attempting to determine whether it could avoid paying Ms. Flitcraft's claims.

44. On November 14, 2014, MetLife wondered in an internal claim note why there was a gap in Mr. Flitcraft's optional Plan coverage between October 5, 2012 and January 1, 2013:[1]

> Thank you for that information. However that enrollment form you provided has an end date of 10/05/2012. The other enrollment forms provided for Optional life start 01/01/2013. What happened to the coverage between 10/05/2012 and 01/01/2013? Please advise.

45. On November 17, 2014, MetLife contacted American Express's Human Resources consultant, AON Hewitt, "to know the exact reason" for the coverage gap, which it said was "necessary to know as it impacts the insured's eligibility":

> We would need to know the exact reason there was a gap in coverage for optional life. This is necessary to know as it impacts the insured's eligibility. Please advise.

46. The next day, MetLife learned that Mr. Flitcraft "was terminated for that timeframe (10/6/2012 to 1/1/2013) because it was the end of his serial severance and he was rehired on 1/2/2013."

47. Three months later, on February 16, 2015, MetLife concluded that it needed to contact American Express to "inquire the correct Plan doc this insured would be covered under." The reasons for MetLife's inquiry was because it had noted an exclusion in reviewing "a few Certs [Certificates of Insurance]" that might apply and allegedly preclude coverage:

> **Additional Comments**
> James, please handle as Shawn is out and his DIT is turned off. Further review of this co-sign is needed. First we need to reach out to admin and inquire the correct Plan doc this insured would be covered under. I reviewed a few Certs in Calligo but cannot determine the correct one for this insured. It appears the plan has a specific provision regarding Previous Employment with the Policyholder. I have pasted it below. We have paid a ported claim already for OLI coverage. This insured was rehired and based on the below provision an employee may not be eligible for life insurance if they are rehired within 2 years after such employment ended unless they surrender any certificate for ported insurance. We need to verify the correct plan doc to see if this provision is in all plans.

48. MetLife paid Ms. Flitcraft the benefits due under the Converted Coverage, $242,000, plus interest, by letter dated February 17, 2015. Upon information and belief, MetLife approved benefits under the lower Converted Coverage policy due to its inherent

---

[1] Screen shots are from MetLife's claim file regarding Mr. Flitcraft's claim, and are true and correct representations of MetLife's internal claim notes.

financial conflict of interest, which creates an incentive for MetLife to minimize claim payouts in order to maximize profits.

49.   On March 2, 2015, MetLife was still seeking "the correct Plan" to determine whether it could apply any exclusions:

> **Additional Comments**
> Hi Cheryl, The claim is for a Stephen Flitcraft- American Express-Claim number 21411004835. We need verification of the correct Plan document in order to verify if he is eligible for benefits. The claim was submitted as an active Employee, date last worked 10/11/2014 under the structure 0102800-0001-0001 for the Basic and 0102805-0001-0001 for the Optional. The Insured had left the company and ported his coverage. He was then rehired and re-enrolled for coverage. We have already paid the ported claim. We need to determine if there is additional coverage under American Express. Please advise Thanks Becky

50.   Two days later, on March 4, 2015, MetLife preliminarily determined that the claimed policy limitation it relied on to deny Ms. Flitcraft's claim might apply. Specifically, MetLife noted that "the SPD indicates on pg 42/84" that if Mr. Flitcraft were rehired within two years of his employment terminating, he could only become covered under the American Express Plan if he "surrendered" any converted individual policies:

> **Comments**
> Marking complex as we have already paid out an OLI under Atlas Portable Pools for American Express (21411001264), employee was terminated and rehired,

> **Additional Comments**
> therefore employee would not be eligible to get other coverage under the same company, the SPD indicates on pg 42/84 ****If You were employed by the Policyholder and insured by Us under a policy of group life insurance when Your employment ended, You will not be eligible for life insurance under this Group Policy if You are re-hired by the Policyholder within 2 years after such employment ended, unless You surrender: ? any individual policy of life insurance to which You converted when Your employment ended; and ? any certificate of insurance continued as ported insurance when such employment ended. The cash value, if any, of such surrendered insurance will be paid to You.

51.   Contrary to MetLife's note, however, the SPD provided to Mr. Flitcraft (Ex. 1), as well as the SPD provided by American Express during the claim appeal process, contain no such limitation. In fact, both the SPD Mr. Flitcraft received and the SPD American Express produced are only 33 pages long — there is no SPD "page 42/84" as MetLife contended.

52.   Nevertheless, MetLife began drafting a letter denying Ms. Flitcraft's claim, noting on March 17, 2015:

> **Additional Comments**
> According to our records, Mr. Flitcraft?s benefits ended on October 5, 2012 since he was no longer employed with American Express Company at which time, he ported his coverage and was individually responsible for premium payments. MetLife has made payment on the ported claim that Mr. Flitcraft carried. The records further indicate he was rehired on January 2, 2013. This was within 2 years of the termination date of October 5, 2012. Thus, the noted Plan provision would apply and there are no further life insurance benefits available. Therefore, based on the record before MetLife, we must deny your claim.

9

53. That same day, March 17, 2015, MetLife sent Ms. Flitcraft its letter formally denying payment of the $529,000 in Plan life insurance coverage; Claim No. 21411004835. In that letter, MetLife asserted that the "Plan states on page 40 of the Summary Plan Description" that if an employee were "re-hired by the Policyholder within 2 years after such employment ended," he would not be eligible for Plan coverage unless he surrendered "any individual policy of life insurance to [sic] which You converted when Your employment ended; and any certificate of insurance continued as ported insurance when such employment ended."

54. On March 19, 2015, after being notified of MetLife's decision denying her claim, Ms. Flitcraft called MetLife to discuss its decision. MetLife explained that "premiums [are] not done thru claims, and we we[re] not aware of issue until we received the files":

> **Additional Comments**
> explained why denied and why and where in the plan page - benefit rep didn't have spd to refer to and opened a benefit center ticket# 2-795653651 for the spouse - adv she can appeal and IF the plan document we have is wrong and there is an updated one that doesn't have this clause thenwe would receive this and re-review - adv premiums not done thru claims, and we we not aware of issue until we received the files - firm rep will look into premium reimbursement if not payable - spouse also wasnt' not happy that portable policy billing acct wastn' turned off timely and she rec multple bills that required a call to us

55. On April 10, 2015, Ms. Flitcraft wrote to MetLife and the American Express Life Insurance Plan Administrator requesting copies of Mr. Flitcraft's claim file, all relevant documents, and multiple documents related to her claim.

56. By letter dated April 21, 2015, MetLife forwarded Ms. Flitcraft certain information related to her claim, but withheld other information that MetLife has in its possession.

57. By e-mail dated April 29, 2015, the Plan forwarded the SPD and the alleged Life Certificate plan document to Ms. Flitcraft. In that e-mail, the Plan directed Ms. Flitcraft to MetLife to obtain the "life insurance claim file for Mr. Flitcraft." The Plan then confirmed that, relating to the Plan coverage, "Mr. Flitcraft paid his premiums through biweekly payroll deductions, and there were no premiums outstanding as of his date of death."

58. By letter dated May 14, 2015, Ms. Flitcraft appealed MetLife's decision to MetLife, the Life Insurance Plan, and the Benefits Committee. Ms. Flitcraft sent her appeal by

facsimile to MetLife, by Priority Mail to MetLife, and by Priority Mail to the Benefits Committee and the Plan.

59. With her appeal, Ms. Flitcraft submitted her sworn testimony in the form of a Declaration, testifying, among other things: about Mr. Flitcraft's work history with American Express; the reasons Mr. Flitcraft elected five times salary life insurance coverage under the Plan when he was re-hired by American Express in 2013; the failures by MetLife and American Express to notify Mr. Flitcraft of any alleged conflict between his Converted Coverage and the Plan coverage; and the failure of MetLife to promptly and reasonably handle her claim for benefits under the Plan coverage.

60. On June 11, 2015, MetLife sent Ms. Flitcraft a check in the amount of $287,000 plus interest. MetLife did not send Ms. Flitcraft any correspondence or other information explaining the reasons it was sending the check.

61. After receiving MetLife's check, Ms. Flitcraft inferred that MetLife had determined that Mr. Flitcraft was entitled to the $529,000 in Plan life insurance coverage and was paying the difference between what it had previously paid, and what remained due.

62. Because MetLife had paid the balance of the $529,000 Plan coverage, the Converted Coverage in the amount of $242,000 was now unpaid and remained at issue. Thus, MetLife had effectively denied Ms. Flitcraft's claim for benefits under the Converted Coverage.

63. On June 25, 2015, Ms. Flitcraft appealed MetLife's decision denying her entitlement to the Converted Coverage. Ms. Flitcraft sent her appeal by facsimile to MetLife, by Priority Mail to MetLife, and by Priority Mail to the Benefits Committee and the Plan.

64. With her second appeal, Ms. Flitcraft submitted her sworn testimony in the form of a Declaration, testifying, among other things: that Mr. Flitcraft wanted the full value of the Converted Coverage and the Plan coverage; that he intended to purchase such coverage; and that if anyone from American Express or MetLife had told Mr. Flitcraft that he allegedly had to surrender the Converted Coverage, he would have elected seven or eight times his salary

(the Plan allowed him to elect up to nine times salary in coverage) to ensure he had commensurate coverage.

65. On June 24, 2015, thirteen days after sending Ms. Flitcraft a check for $287,000 plus interest, MetLife mailed a letter to Ms. Flitcraft through her counsel. In that letter, MetLife stated that its "decision to deny your client's claim was partially upheld, but additional benefits were released to your client, so that your client should have received a total of $529,000 from us, comprised of Basic Life Insurance in the amount of $106,000 and Optional Life Insurance in the amount of $423,000." In other words, MetLife had determined that it was liable for the Plan coverage of $529,000 but was now treating Mr. Flitcraft's Converted Coverage as surrendered by MetLife decree.

66. Ms. Flitcraft did not receive MetLife's June 24, 2015 letter until several days after submitting her June 25, 2015 appeal.

67. On July 10, 2015, the Benefits Committee and the Plan e-mailed Ms. Flitcraft's counsel stating, among other things: "MetLife serves as the Claim Fiduciary for the American Express Life Insurance Plan, as indicated on page 23 of the attached Summary Plan Description, and therefore makes all claim and appeal decisions. We have confirmed with MetLife that they received your letter. MetLife will review the appeal and will respond to you directly."

68. On August 27, 2015, Ms. Flitcraft's counsel contacted MetLife and was informed that MetLife was not considering Ms. Flitcraft's second appeal and that its June 24, 2015 decision was final.

69. Accordingly, defendants have refused to pay the Converted Coverage due under Mr. Flitcraft's individual disability policy.

70. Ms. Flitcraft has suffered financial damage as a result of defendants' wrongful refusal to pay her the benefits due under the Converted Coverage.

71. As a result of defendants' wrongful decision denying Ms. Flitcraft the full life insurance benefits to which she is entitled, Ms. Flitcraft has suffered financial harm and emotional distress.

72. Ms. Flitcraft has exhausted her administrative remedies.

73. Ms. Flitcraft's claim is ripe.

### Count One:  Breach of Contract (MetLife)

74. Plaintiff Melanie Flitcraft incorporates paragraphs 1 through 73 as though fully set forth herein.

75. When Mr. Flitcraft was an employee with American Express in 2012, he was covered under an ERISA-governed life insurance plan provided by his employer.

76. When Mr. Flitcraft retired in 2012, he converted his coverage under the life insurance plan to an individual policy not subject to ERISA.  *Waks v. Empire Blue Cross/Blue Shield*, 263 F.3d 872 (9th Cir. 2001).

77. When Mr. Flitcraft converted his coverage under the life insurance plan to a non-ERISA insurance policy, he had a contract for life insurance with MetLife.

78. Ms. Flitcraft is the named 100% primary beneficiary of the life insurance contract.

79. Mr. Flitcraft complied with each and every term of his contract, including timely paying all premiums due under the contract.

80. Without just cause or excuse, MetLife has refused to pay Ms. Flitcraft the benefits to which she is entitled under the contract.

81. As a consequence of MetLife's breach of the contract, Ms. Flitcraft has suffered damages including, but not limited to:  the loss of the benefits to which she is entitled under the contract and attorney's fees expended when Ms. Flitcraft was forced to retain an attorney to appeal MetLife's wrongful decision.

### Count Two:  Breach of the Obligation of Good Faith and Fair Dealing (MetLife)

82. Plaintiff Melanie Flitcraft incorporates paragraphs 1 through 81 as though fully set forth herein.

83. MetLife ignored information in the file that supported Ms. Flitcraft's entitlement to full life insurance benefits under the Plan coverage and under the Converted Coverage.

84. MetLife chose to focus and rely on one document and purposefully disregarded other documents, information, and the complete picture regarding Ms. Flitcraft's claim to find any ostensible support for its desire to deny Ms. Flitcraft's claim.

85. MetLife had no reasonable basis to delay and deny payment of benefits under the Converted Coverage life insurance policy.

86. In delaying and denying benefits to Ms. Flitcraft, MetLife knew that it was acting without a reasonable basis in its investigation and evaluation of her claim.

87. In all aspects of investigating or evaluating Ms. Flitcraft's claim for benefits under the life insurance policy, MetLife failed to give Ms. Flitcraft's interests at least as much consideration as its own, and instead elevated its interests above Ms. Flitcraft's.

88. MetLife failed to reasonably or fairly investigate Ms. Flitcraft's claim, failed to take reasonable measures to ensure the proper payment of Ms. Flitcraft's claim, and deliberately conducted a biased and outcome-focused investigation in order to deny Ms. Flitcraft's claim.

89. MetLife acted unreasonably by ignoring the weight of the evidence and disregarding information supporting Ms. Flitcraft's claim, despite having no reasonable basis for doing so.

90. MetLife intended to injure Ms. Flitcraft and/or acted to serve its own interests, having reason to know and consciously disregarding the substantial risk that its conduct would significantly injure Ms. Flitcraft financially, emotionally, and mentally, and would cause her anger, frustration, and emotional suffering, among other things.

91. As a direct and proximate result of MetLife's wrongful conduct, Ms. Flitcraft has suffered anxiety, worry, frustration, and mental and emotional distress.

92. MetLife's intentional and wrongful actions were guided by an evil mind and meant to cause harm, and did cause harm to Ms. Flitcraft, who seeks exemplary and punitive damages against MetLife to deter similar conduct in the future and to redress the bad conduct complained of herein.

93. MetLife's duty of good faith and fair dealing towards Ms. Flitcraft is continuous and did not end with the denials of her claim in March 2015 or June 2015.

**Count Three (In the Alternative):  Claim For Benefits Under ERISA (All Defendants)**

94. To the extent Ms. Flitcraft's claims are subject to ERISA, she pleads in the alternative as follows.

95. With respect to all ERISA claims, Ms. Flitcraft asserts that defendants acted under an inherent financial conflict of interest, that their financial conflicts of interest infected the claim handling process and drove the decisions seeking to minimize defendants' claim exposure, that Ms. Flitcraft is entitled to discovery to show the effect of those conflicts of interest on the claim decision, and that defendants' decisions are entitled to little or no deference under ERISA because those decisions were driven or influenced by defendants' inherent financial conflicts of interest.

96. Plaintiff Melanie Flitcraft incorporates paragraphs 1 through 95 as though fully set forth herein.

97. The SPD states: "This document, along with the insurance contracts through which benefits are provided, is also the written instrument for the Plan…" *See* SPD, Ex. 1 at 3. Accordingly, the SPD is the operative Plan instrument pursuant to 29 U.S.C. § 1102(a)(1) and the terms of the SPD therefore control Ms. Flitcraft's entitlement to benefits.

98. The SPD permits Mr. Flitcraft to maintain Plan coverage and Converted Coverage.

99. The SPD does not require Mr. Flitcraft to surrender any converted or ported coverage upon being rehired within two years of his employment ending.

100. Under the plain language of the SPD, there is no conflict in Mr. Flitcraft maintaining the Plan coverage and the Converted Coverage simultaneously.

101. Under the plain language of the SPD, Ms. Flitcraft is entitled to benefits under the Converted Coverage.

102. Defendants' decision denying Ms. Flitcraft the benefits to which she is entitled is wrongful and has caused Ms. Flitcraft to suffer harm, entitling her to recover the benefits due under ERISA.

**Count Four (In the Alternative):  Equitable Relief Under ERISA Due To Defendants' Breaches of Their Fiduciary Duties (All Defendants)**

103. Plaintiff Melanie Flitcraft incorporates paragraphs 1 through 102 as though fully set forth herein.

104. Under *Cigna Corp. v. Amara*, 131 S.Ct. 1866 (2011), ERISA plan participants who are harmed by a fiduciary's misstatements or misrepresentations regarding plan terms are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) to remedy the harm caused by the misstatements or misrepresentations.

105. Under *Amara*, equitable relief may include:  reformation of the plan to conform to the fiduciary's representations; equitable estoppel; or a "surcharge" to compensate the participant for the harm caused by the fiduciary's breach. *Id*. at. 1879-1880.

106. Neither plan reformation nor surcharge "insist upon a showing of detrimental reliance." *Id*. at 1880.  The plan participant "need only show harm and causation." *Id*. at 1881.

107. Defendants have breached their fiduciary duties under ERISA by, among other things:  failing to provide Mr. Flitcraft with any notice of the claimed policy limitation requiring him to surrender the Converted Coverage upon being rehired within two years; misrepresenting that Mr. Flitcraft was automatically covered upon his rehiring and could elect new optional life coverage as long as he was hired in a "subsequent" calendar year; providing Mr. Flitcraft with an SPD that constitutes the operative plan document but then disclaiming that documents' terms to support a wrongful claim denial; having information that Mr. Flitcraft was enrolled under the Plan and the Converted Coverage through, among other things, his payment of monthly premiums under both policies, and failing to inform him of any alleged conflict in the coverage; and more.

108. Mr. Flitcraft relied on defendants' breaches of their fiduciary duties, including their representations and omissions, in electing his life insurance coverage amounts.

109. Based on defendants' representations and omissions, Mr. Flitcraft decided to forego electing seven, eight, or nine times his salary in optional life coverage as he was permitted to do under the Plan, and relied on his having five times salary coverage under the Plan in addition to the Converted Coverage.

110. Ms. Flitcraft has been harmed by defendants' breaches of their fiduciary obligations.

111. Ms. Flitcraft is entitled to equitable relief under ERISA and *Amara*, including but not limited to: reformation of the plan to conform to the fiduciaries' misrepresentations, equitable estoppel, and/or a surcharge in the amount of the benefits available under the Converted Coverage. *Id.*; *accord Echague v. Metro. Life Ins. Co.*, 43 F.Supp.3d 994, 1017 (N.D. Cal. 2014) (imposing equitable surcharge under nearly identical circumstances).

### Count Five (In the Alternative): Waiver Under ERISA (All Defendants)

112. Plaintiff Melanie Flitcraft incorporates paragraphs 1 through 111 as though fully set forth herein.

113. Defendants either knew or should have known of the alleged surrender term under the life insurance plan.

114. Defendants either knew or should have known that Mr. Flitcraft was enrolled in life insurance under the Converted Coverage and under the Plan.

115. Defendants waived the alleged requirement that Mr. Flitcraft surrender the Converted Coverage to become covered under the Plan. *See e.g. Gaines v. Sargent Fletcher, Inc.*, 329 F.Supp.2d 1198, 1204 (C.D. Cal. 2004).

116. Because defendants have waived the alleged surrender term under the life insurance plan, Ms. Flitcraft is entitled to the full benefits under the Converted Coverage in addition to the Plan benefits already paid to her.

**Count Six:  Statutory Penalties Under ERISA (All Defendants)**

117. Plaintiff Melanie Flitcraft incorporates paragraphs 1 through 116 as though fully set forth herein.

118. Under ERISA, Ms. Flitcraft is entitled to all information relevant to her claim, free of charge.  29 U.S.C. §§ 1132(a)(1)(A) and (c)(1)(B).

119. If an administrator fails to provide requested information within 30 days of a request, it is liable for statutory penalties in the amount of $110 per day for each day the information is delayed.  *Id*.; 29 C.F.R. 2575.502c-1.

120. On April 10, 2015, Ms. Flitcraft requested all information relevant to her claim, and to Mr. Flitcraft's coverage under the Plan and the Converted Coverage, from MetLife, from the Benefits Committee, and from the Plan.

121. While defendants provided some information relevant to Ms. Flitcraft's claim, they failed to provide all relevant and requested information.

122. Because defendants failed to provide all relevant information, Ms. Flitcraft was prejudiced in her ability to prepare her appeal.

123. Because defendants failed to provide all relevant information, Ms. Flitcraft was prejudiced in her ability to develop the ERISA administrative record.

124. Because defendants failed to provide all relevant information, Ms. Flitcraft is entitled to statutory penalties of $110 per day for each day the production of that information has been delayed.

125. Because defendants failed to provide all relevant information, Ms. Flitcraft is entitled to discovery to enable her to fully develop the ERISA administrative record.

**Demand For Jury Trial:**

126. Pursuant to Fed. R. Civ. P. 38(b) Plaintiff demands trial by jury on Counts One and Two of her Complaint.

**Prayer For Relief:**

Wherefore, Plaintiff Melanie Flitcraft prays for relief as follows:

1. The benefits due to her under the Converted Coverage;

2. Attorney's fees incurred by Ms. Flitcraft in pursuing her appeal;

3. An award of damages for emotional distress, humiliation, inconvenience, and anxiety against MetLife as a result of MetLife's tortious breach of the obligation of good faith and fair dealing, as previously set forth herein;

4. An award of punitive damages against MetLife sufficient to punish MetLife and to deter the company and similarly situated defendants from engaging in similar conduct in the future, commensurate with the reprehensibility of MetLife's conduct as provided by law;

5. Reasonable attorneys' fees pursuant to A.R.S. § 12-341.01 and/or ERISA, 29 U.S.C. § 1132;

6. Taxable costs;

7. Interest on all amounts awarded at the highest rate permitted by law; and

8. Such other relief as is just and equitable, or that may be provided by law.

Dated this 8th day of September, 2015.

LAW OFFICE OF PATRICK MAUSE, PLLC


*/s/ Patrick W. Mause*
Patrick W. Mause
290 North Meyer
Tucson, Arizona 85701

Attorney for Plaintiff